CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 5 2019

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LOIS J., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00066 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:    Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Lois J. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). ECF No. 16. Having considered the administrative record, the parties'

briefs, and the applicable law, I cannot find that substantial evidence supports the

Commissioner's denial of benefits. Accordingly, I recommend that the presiding District Judge

reverse the decision and remand the matter for further proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

1

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

2

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1] The claimant

bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden

shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In August 2013, Lois J. filed for DIB and SSI alleging that she had been unable to work

since May 2012 because of diabetes, high blood pressure, obesity and lap-band surgery, back

pain and muscle spasms, and problems with her knees and ankles. *See* Administrative Record

("R.") 40, 88–89, 96–97, 206–07, 208–14, ECF No. 9-1. Disability Determination Services

("DDS"), the state agency, denied her claims initially in January 2014, R. 88–105, and upon

reconsideration that September, R. 106–29. On February 17, 2016, Lois J. appeared with counsel

and testified at an administrative hearing before ALJ William Barto. *See* R. 59–87. A vocational

expert ("VE") also testified at this hearing. R. 78–85.

ALJ Barto issued an unfavorable decision on March 18, 2016. R. 40–53. He found that

Lois J. had severe medical impairments of "obesity, right lower extremity knee with advanced

tricompartment[al] degenerative changes, mild degenerative changes in the hip, and degenerative

disc disease in the lower back." R. 42. None of these impairments, alone or combined, met or

medically equaled the relevant musculoskeletal Listings. R. 43–44. ALJ Barto then evaluated

Lois J.'s residual functional capacity ("RFC") and found that she could "perform a range of light

work" as defined in the regulations, "except she [could] stand and/or walk for up to two hours

daily [and] must change positions between sitting and standing at will."[2] R. 44. She also could

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest strength requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling

"occasionally climb ramps/stairs, balance, stoop, kneel, couch, and crawl" and "frequently reach,

handle, finger, and feel" with either upper extremity, but never "climb[] ladders/ropes/scaffolds

or [tolerate] exposure to workplace hazards." *Id.* (punctuation corrected). Based on this RFC

finding and the VE's testimony, ALJ Barto concluded at step five that Lois J. was not disabled

after May 2012 because she could perform representative occupations offering a significant

number of jobs in the economy, such as credit card interviewer, appointment clerk, or addresser.

R. 52; *see* R. 80–85. The Appeals Council declined to review the ALJ's decision, R. 1–6, and

this appeal followed.

## III. Discussion

Lois J.'s arguments on appeal challenge ALJ Barto's RFC determination. *See generally*

Pl.'s Br. 4–13, ECF No. 19. A claimant's RFC represents her "maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis" despite

her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R.

§§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the

relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31

(4th Cir. 2011) (per curiam), and must reflect the combined functionally limiting effects of

impairments that are supported by the medical evidence or the claimant's credible reports of pain

or other symptoms,[3] *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). "This RFC

---

of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

[3] The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC determination. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*,

assessment is a holistic and fact-specific evaluation," *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017), which must account for any functional limitations the ALJ identified at steps two or three of his decision, *see Mascio*, 780 F.3d at 638–39; *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10 (W.D.N.C. Dec. 21, 2015). The ALJ's decision must also "include a narrative discussion describing how" specific medical facts and nonmedical evidence "support[] each conclusion" in the RFC assessment, *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017).

Lois J. broadly argues that ALJ Barto's RFC assessment did not include a narrative discussion describing how specific medical facts or other credited evidence supported his conclusions about her physical abilities. She further argues that the ALJ's reasons for discounting her subjective statements alleging even more severe pain-related limitations than those ALJ Barto identified were not supported by substantial evidence in the record.[4] *See* Pl.'s

---

858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640. A reviewing court will uphold the ALJ's credibility determination so long as his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

[4] Lois J. also objects to ALJ Barto's finding that she did not produce "any objective support" for her testimony that she uses a cane to help her stand and walk. Pl.'s Br. 6; *see* R. 45, 49, 72–73. The ALJ must consider "the impact of 'medically required' hand-held devices," such as a cane or walker, when evaluating the claimant's RFC. *Wimbush v. Astrue*, No. 4:10cv36, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011) (quoting SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996)). "To find that a hand-held assistive device is medically required, there must be medical documentation [1] establishing the need for a hand-held assistive device to aid in walking or standing and [2] describing the circumstances for which it is needed," SSR 96-9p, 1996 WL 374185, at *7. *See Timmons v. Colvin*, No. 3:12cv609, 2013 WL 4775131, at *8–9 (W.D.N.C. Sept. 5, 2013). Lois J.'s objection focuses only on the first criterion—i.e., that she produce medical documentation establishing that she actually needs to use the cane. Pl.'s Br. 6. But, ALJ Barto also reasonably found that Lois J.'s record contained "no medical documentation . . .

5

Br. 3–13. In making both arguments, Lois J. points out several examples where ALJ Barto

appears to have cherrypicked evidence from the medical reports to support his RFC finding,

while minimizing or overlooking evidence that bolstered Lois J.'s subjective allegations. These

objections are persuasive.

A.    *Summary*

Lois J. worked full-time as a manager at a fast-food restaurant from November 1987 until

May 2012. R. 231. She spent most workdays standing and walking on concrete and unloading

boxes from a delivery truck. *See* R. 232, 358. Eventually she developed severe pain in her lower

back and both knees, R. 71, 78, 358, 373, which was exacerbated by her morbid obesity, *see* R.

235–36, 327, 419. In May 2010, Lois J. had gastric bypass (lap-band) surgery because she

weighed almost 500 pounds. *See* R. 327, 419. She lost about 80 pounds after surgery, but she still

struggled to control her weight and chronic joint pain. *See* R. 327, 358, 388. In May 2012, Lois J.

left her job "by mutual agreement" because she was spending too much time sitting down trying

to relieve her knee pain. R. 71; *see* R. 327, 358, 373.

Lois J. received her routine healthcare from family nurse practitioners ("FNP") at

Piedmont Access to Health Services ("PATHS") Community Medical Center. *See* R. 110–11,

122, 233, 235, 276–78, 287. On August 2, 2013, she saw Judy Broughton, FNP, with complaints

of joint pain related to obesity and osteoarthritis. R. 327–30. Lois J. was "morbidly obese" at 415

pounds (BMI 59.5), but the rest of her physical examination was normal. R. 327–28; *see* R. 45.

FNP Broughton administered two therapeutic injections (Solumedrol, Toradol) and gave Lois J.

---

describing the circumstances for which" she allegedly needed the cane, R. 49, and Lois J. does not
challenge that finding, *see* Pl.'s Br. 6–7. Accordingly, the ALJ's "failure to include [her] use of a cane in
the RFC" determination, Pl.'s Br.7, was not reversible error. *Cf. Timmons*, 2013 WL 4775131, at *8–9
(finding no error in ALJ's RFC finding, which did not accommodate the use of a prescribed cane, where
"neither the prescription nor other evidence show[ed] how Plaintiff actually use[d] the cane, or that it
[was] medically required").

a sample of topical pain-relief cream to use three times daily. *See* R. 328–29. She also wrote a

prescription for Lortab, which Lois J could take "sparingly" as needed for pain. *Id.* On August

16, Lois J. reported that "the cream and shots . . . ha[d] not helped" her back and knee pain. R.

324. The Lortab helped at night, but she was "willing to try any meds" to manage her pain during

the day. *Id.* Other than Lois J.'s weight (402 lbs.) and BMI (57.6), relevant findings on that

date's physical examination were unremarkable. *Id.*; *see* R. 45. FNP Broughton told Lois J. to

continue using Lortab "sparingly" and prescribed Neurontin three times daily for pain. R. 325.

An X-ray of the right knee taken in September 2013 showed "advanced tricompartmental

degenerative changes," but no fracture or dislocation. R. 321. On November 14, Lois J. saw

Elizabeth Pickeral, FNP, to evaluate increasing back pain and muscle spasms. R. 341. She

reported using Lortab as prescribed, but explained that she had to ration the Neurontin because it

was "too expensive" to use every day. *Id.* On exam, FNP Pickeral noted that Lois J. was

"morbidly obese" at 408 pounds; walked with a slow, steady gait; got "on/off [the] exam table

slowly"; and endorsed tenderness to palpation of the right lower back. *Id.*

Lois J. returned to PATHS every few months throughout the relevant period. R. 343–47

(Feb. 2014); R. 387–91 (Aug. 2014); R. 380–84 (Oct. 2014); R. 427–29 (Jan. 2015); R. 423–26

(Apr. 2015); R. 433–36 (Aug. 2015). In February 2014, Lois J. reported that her conditions kept

her "somewhat housebound." R. 343. FNP Broughton explained that their "goal [was] to

decrease [Lois J.'s] pain to [a] functional level," but that Lois J. should "expect good days and

bad days" because treatment "will never totally remove [the] pain." R. 345. Lois J. consistently

reported lower back and bilateral knee pain that was worse when sitting, standing, or walking,

and had not satisfactorily responded to repeated injections and various combinations of

prescription pain medications and muscle relaxants. *See, e.g.*, R. 388–90 (Aug. 2014); R. 423

7

(Apr. 2015), 427–29 (Jan. 2015). FNP Broughton's exam notes generally show that Lois J. was morbidly obese, but otherwise had normal extremities; full range of motion in the back, albeit with occasional tenderness on palpation of the spine; and full muscle strength throughout. R. 383–84, 388, 424, 434. *But see* R. 343–44 (noting that Lois J. could not get on the exam table and had crepitus in both knees, paravertebral discomfort and spasms on palpation of the back, and "limited" range of motion in the spine secondary to morbid obesity (Feb. 2014)); R. 424 (noting "mild edema, crepitus, and painful" range of motion in both knees (Apr. 2015)). Lois J. weighed between 398 and 418.5 pounds (BMI 51.1 to 60.0) on these visits. *See* R. 380, 383, 387–88, 423, 427–28, 433–35. In January 2015, Lois J. reported that her right hip had hurt for the past several months, making it even more painful for her stand, walk, and climb stairs. R. 427. FNP Broughton observed "good [range of motion] with discomfort in both hips," but noted that rotating the right hip elicited such "severe pain" that Lois J. started crying on exam. R. 428. An X-ray of that hip taken a few days later showed "mild degenerative disease of the acetabulum" with no acute findings. R. 417.

On May 7, 2014, Lois J. saw orthopedist Douglas Kells, M.D., to evaluate her bilateral knee pain. R. 358–66. She reported "popping and clicking in her knee joints" and increased pain when standing up, walking, or climbing stairs. R. 358. Her knees also "g[ave] way on occasion." *Id.* On exam, Dr. Kells noted that both knee joints allowed "full extension to 90 degrees" and were "stable at 0, 25, and 45 degrees of flexion," but had "retropatellar crepitation on active range of motion." R. 359. Lois J. also was "tender on the medial joint line of both knee joints." *Id.* X-rays taken the same date showed "end-stage arthritis of both knee joints with bone-on-bone condition of the medial joint spaces bilaterally," subluxation of the right patella, and "varus deformity" in both knee joints. R. 359, 361; *see also* R. 365 (noting "severe" medial

8

compartment joint space narrowing and "bulky tricompartmental osteophyte formation from arthrosis" bilaterally). Dr. Kells offered treatment "options of over-the-counter medication, observation, modification of activities, anti-inflammatories by prescription, bracing, [and] cortisone injections." R. 359. They also briefly discussed knee surgery, but Dr. Kells cautioned that "surgeons prefer not to operate on individuals with BMI greater than 40" given the increased risk of postoperative complications. *Id.* Lois J. weighed 401 pounds that day, which put her BMI at 57.54. R. 360. Dr. Kells administered cortisone injections in both knees and instructed Lois J. to return to his clinic "in the near future should she have any further problems or questions." R. 359. Otherwise, she should continue to see FNP Broughton for routine care. *Id.*

Lois J. saw Saeed Jadali, M.D., for a consultative physical examination on September 6, 2014. *See* R. 373–78. She reported bilateral knee pain that was "7 out of 10 on average" and "10 out of 10 with activity." R. 373. Even "standing up cause[d] severe pain." *Id.* She also reported chronic lower back pain with occasional radiation into the right leg and weakness in the left leg. *Id.* Dr. Jadali observed that Lois J. had "difficulty standing up," walked with a "[m]ild antalgic gait," and became short of breath climbing onto the exam table and doing range-of-motion exercises. R. 375–76. Her muscle tone and strength were normal and symmetrical throughout. R. 376. Lois J. also had full range of motion in every joint except on flexion of both knees (80/150°) and hip joints (40/100°). R. 378. Dr. Jadali could not complete a straight-leg raising test because Lois J. was "unable to raise the leg more than 40 degrees" secondary to obesity. R. 376. She weighed 405 pounds that day. R. 375. Dr. Jadali assessed morbid obesity and degenerative joint disease of the lumbar spine and knees. R. 376.

In 2015, FNP Broughton referred Lois J. to a pain-management clinic because PATHS providers did not prescribe narcotics for long-term use. *See* R. 425, 444–54. That October, Lois

J. established care with Carla Hart-Tyner, ANP, to manage the chronic pain in her right hip and

both knees. R. 444–45. She described constant severe aching, throbbing pain that was worse with

standing, walking, and bending. R. 445. Lois J. had tried Lortab, Naproxen, Gabapentin,

Topamax, and Baclofen, but still saw "no improvement" in her pain and muscle spasms. *Id.* Dr.

Kells's bilateral knee injections had "not provide[d] any pain relief," either. R. 446. Lois J. had

not had surgery, R. 445, but she was still "working at weight loss for knee arthroplasty," R. 449.

She now weighed 396 pounds (BMI 56.82). R. 448. On exam, ANP Hart-Tyner observed that

Lois J. walked with a limp, had swelling and pain with range of motion in both knees, endorsed

tenderness on palpation of the lumbar paraspinal muscles, had "limited" range of motion

throughout the lumbar spine and "lost" lumbar lordotic curve, and had positive Patrick/FABER

tests, right greater than left. R. 448. She prescribed three new pain medications and gave Lois J. a

TENS device to use while considering "injection therapy as a future option." R. 449.

The record contains three medical opinions about Lois J.'s impairment-related functional

limitations. *See* R. 91–92, 99–100 (DDS, initial); R. 112–13, 123–24 (DDS, reconsideration); R.

376–77 (Dr. Jaladi). All three physicians agreed that Lois J. could occasionally lift or carry

twenty pounds; frequently lift or carry at least ten pounds; occasionally bend, stoop, or crouch;

and sit for about six hours during a normal eight-hour workday. *See id.* They offered slightly

different assessments of her ability to stand and/or walk throughout a workday. Josephine Cader,

M.D., who initially reviewed Lois J.'s records submitted to DDS through October 29, 2013, *see*

R. 112–14, 123–25, opined that she should be "limited to 4–5 hours due to [m]orbid obesity and

knee pain," R. 91–92, 99–100. In September 2014, Dr. Jaladi opined based on his examination

findings that Lois J. could stand and/or walk for "two to four hours with breaks" during an eight-

hour workday. R. 376. Luis Zuniga, M.D., who reviewed Lois J.'s updated medical records[5] for DDS in late September 2014, opined that Lois J. could stand and/or walk for two hours with during an eight-hour workday. R. 112, 123. In explaining this restriction, however, Dr. Zuniga merely reiterated Dr. Cader's rationale that Lois J.'s ability to "[s]tand and walk [was] limited to 4–5 hours due to [m]orbid obesity and knee pain." R. 113, 124. None of the physicians suggested that Lois J. should be allowed to switch between sitting and standing at will.

In statements to the agency, Lois J. maintained that she could not work during the relevant period because constant pain in her lower back, right hip, and both knees severely restricted her capacities to sit, stand, walk, and engage in postural activities like bending or climbing stairs. *See generally* R. 71–78 (Feb. 2016); R. 90, 101, 238, 248–49, 251 (Oct. 2013); R. 261, 271 (Apr. 2014). Prescription pain medications and muscle relaxants helped for a while, R. 239, 262, but they were not strong enough to provide adequate relief, R. 90, 101, 261. They also made her drowsy. R. 68, 74, 262. She estimated that she could carry a "half a gallon of milk," R. 77, and walk at most fifty feet before needing to stop and rest for fifteen minutes, R. 77, 271. Lois J. frequently sat down while performing daily tasks, R. 73–74, 76–77, 245–46, 248, and sometimes she used a cane or held on to the wall for support when standing and walking, R. 90, 101, 250. In mid-2015, she decided to start using the cane full time because she was afraid that she might fall and injure herself. *See* R. 72–73. Lois J. could sit for fifteen or thirty minutes before needing to stand and stretch her legs. R. 76, 261–62. She could not squat, stoop, or kneel at all because it hurt her knees and ankles. R. 239, 249, 262, 271. Morbid obesity only exacerbated these problems. *See* R. 72, 90, 101, 251. In February 2016, Lois J. testified that she was essentially housebound, but she could usually go to church on Sundays and went to the

---

[5] These records did not include Dr. Kells's examination findings or the May 2014 X-rays showing varus deformity and end-stage arthritis with bone-on-bone condition of the medial joints in both knees. *See* R. 107–14, 118–25.

grocery store about once a month. *See* R. 73–77. She had a disabled parking placard and used a motorized cart to do her shopping. R. 73.

B.    *The ALJ's Decision*

ALJ Barto considered Lois J.'s medical impairments and alleged functional limitations throughout his written decision. R. 42–50. At step two, he found that Lois J.'s diagnosed obesity, "mild degenerative changes in the hip," "degenerative disc disease in the lower back," and "right lower extremity knee with advanced tricompartment[al] degenerative changes" were severe medically determinable impairments ("MDI") because they caused "more than minimal limitations in [her] ability to perform basic work activities,"[6] R. 42, which, according to the regulations include physical functions like "walking, standing, sitting, [and] lifting," 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). At step three, ALJ Barto acknowledged that he must consider the limiting effects of Lois J.'s severe obesity even though there is no Listing for that impairment. R. 43 (citing SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002)). He explained, for example, that "[s]omeone with obesity and arthritis affecting a major weight-bearing joint may have more pain and limitation that might be expected from arthritis alone," and that "obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an 8-hour workday [and] five-day workweek." *Id.* ALJ Barto then concluded that Lois J did not have "an impairment or combination of impairments" that met or medically equaled Listing 1.02 (major dysfunction of a joint) because

the evidence of record [did] not establish that [she had] a gross anatomical

---

[6] ALJ Barto also found that her "history of diabetes mellitus, essential hypertension, and hyperlipidemia" were "nonsevere" medically determinable impairments, R. 42–43, and Lois J. does not challenge these findings on appeal, *see generally* Pl.'s Br. 4–13. Additionally, although ALJ Barto did not expressly find that Lois J. had a severe MDI affecting her *left* knee, he correctly noted that X-rays of the knees taken in May 2014 showed bilateral genu varus deformity and "end-stage arthritis of both knee joints with bone-on-bone condition of the medial joint spaces bilaterally," R. 46 (citing R. 357–66), and he acknowledged Lois J.'s consistent complaints that she had severe pain in both knees, R. 46–48.

deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). Further, there [was] no involvement of one major peripheral weight-bearing joint resulting in the inability to ambulate effectively . . . .

*Id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02(A)). Although ALJ Barto discussed specific medical exhibits documenting all but one of these criteria when summarizing Lois J.'s treatment records as part of the subsequent RFC assessment, R. 45–48, he did not explain his conclusion that "the evidence" did not meet or medically equal Listing 1.02.[7]

Next, ALJ Barto found Lois J. could "perform a range of light work, . . . except she [could] stand and/or walk for up to two hours daily[,] must change positions between sitting and standing at will," and had other restrictions on postural activities and workplace environments. R. 44. He later explained that the RFC finding was "supported by the objective medical evidence," Dr. Cader's and Dr. Zuniga's medical opinions, and his decision to afford Lois J. "the maximum benefit by further limiting her based on [his] review of the entire record." R. 50. ALJ Barto also noted that he rejected Dr. Jaladi's opinion of Lois J.'s "exertional abilities" because the limitations identified in that opinion were not restrictive enough, and that he gave Dr. Zuniga's opinion the greatest weight overall because "it [was] balanced and objective, consistent with the overall evidence of record, and support[ed] the residual functional capacity outlined in [his] decision." *Id.*

---

[7] Nonetheless, ALJ Barto's step-three conclusion is supported by the record. Listing 1.02(A) requires medical evidence showing, among other things, gross anatomical deformity in a major peripheral weight-bearing joint "resulting in inability to ambulate effectively." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02(A). "Ineffective ambulation is defined generally as having insufficient lower extremity function . . . to permit independent ambulation without the use of a handheld assistive device(s) that limits functioning of *both* upper extremities." *Id.* § 1.00(B)(2)(b)(1) (emphasis added). Here, Lois J. testified that she used one single-point cane to help her stand and walk. R. 72, 77. Although Lois J. challenges ALJ Barto's RFC determination that she did not produce "any objective support" showing that her use of the "assistive device [was] medically necessary," R. 49, she does not challenge his step-three conclusion that her degenerative orthopedic impairments did not "result[] in the inability to ambulate effectively," R. 43. *See* Pl.'s Br. 6–7.

ALJ Barto then set out a reasonably detailed and accurate summary of Lois J.'s complaints of pain and other symptoms, R. 44–46, and the medical-source evidence related to her impairments and alleged functional limitations, including nearly all of the relevant findings on X-rays and physical exams, R. 46–50 (citing R. 321, 324, 327, 341, 343, 357–66, 380, 373–78, 383, 388, 417, 423, 427–28, 433, 444–55).[8] He found that Lois J.'s MDIs "could reasonably be expected to cause [the] alleged symptoms," but her statements describing the debilitating degree and effects of those symptoms were "only partially credible for the reasons explained in [his] decision." R. 48. Two of those reasons had something to do with Lois J.'s allegations that her chronic back, hip, and bilateral knee pain was so severe or physically limiting that she could not maintain gainful employment. First, ALJ Barto explained that Lois J.'s "relatively benign physical examinations belie [her] allegations of disabling symptoms or functional limitations," R. 50, and that "repeated physical examinations ha[d] failed to reveal . . . significant neurological deficits or decreased strength or range of motion, as would be expected" given the "significant" pain and limitations Lois J. described, R. 49. As support for this finding, ALJ Barto pointed to Lois J.'s "normal" physical exams on August 2 and August 16, 2013; August 8, 2014; and October 3 and October 31, 2014. R. 48 (citing R. 324, 328, 380, 383–84, 389). Although ALJ Barto's summary of these same treatment notes indicates that he thought Lois J.'s extreme weight and BMI were actually outside normal limits, R. 45–47, he did not explain why he subsequently found that these physical examinations were in fact "entirely normal," R. 48. ALJ Barto also did not mention any of the abnormal findings on X-rays and physical examinations—

---

[8] ALJ Barto did not mention Dr. Jadali's findings that Lois J. had severely diminished flexion in both knees (80/150°) and hip joints (40/100°) on exam in September 2014, R. 378; FNP Broughton's observation that Lois J. "crie[d] on external rotation" of the right hip on exam in January 2015, R. 428; or ANP Hart-Tyner's findings that Lois J. was "limping," had positive Patrick/FABER tests bilaterally, and exhibited no lordotic curve of the lumbar spine on exam in October 2015, R. 448.

including "bone-on-bone" joint degeneration in both knees and painful, limited range of motion in the lower back, knees, and right hip—from September and November 2013; February, May, and September 2014; and January, April, and October 2015, even though he had just recited much of that evidence when summarizing the treatment record. R. 46–48.

Second, ALJ Barto found that the treatment Lois J. received for her degenerative orthopedic conditions and chronic pain had been "routine, conservative, and unremarkable, as no surgery ha[d] been recommended (due to her weight), and she ha[d] been treated primarily with medications which [were] relatively effective in controlling [her] symptoms." R. 49. He cited two instances where Lois J. told FNP Broughton that "Lortab helped her osteoarthritis pain" and "that Neurontin was better than Topamax for her chronic pain." R. 49 (citing R. 324, 390). He did not mention Lois J.'s contemporaneous comments that "Lortab helps at night but she [was] willing to try any meds" to manage her pain during the day, R. 324, and that both "knees hurt[] real bad" even though she took four prescription-strength pain relievers and muscle relaxants, R. 388. ALJ Barto's summary of the medical record also omits Lois J.'s report to ANP Hart-Tyner in October 2015 that she had tried Lortab, Naproxen, Gabapentin, Topamax, Baclofen, and cortisone injections, but still saw "no improvement" in the constant, severe back and bilateral knee pain that limited her ability to sit, stand, walk, and bend, R. 445, as well as her fairly consistent prior reports to FNP Broughton that these symptoms were not responding to multiple therapeutic injections and different combinations of prescription medications, *see* R. 343–47 (Feb. 2014); 388–90 (Aug. 2014); R. 423 (Apr. 2015); R. 427–29 (Jan. 2015).

The other four reasons the ALJ gave for rejecting Louis J.'s description of her symptoms had no apparent connection to her complaints of pain.[9] R. 48–50; *see Mascio*, 780 F.3d at 639

---

[9] ALJ Barto also found that Lois J. had "not been entirely compliant in using prescribed medications, . . . which suggest[ed] that the symptoms may not have been as limiting as [she] alleged in connection with

(faulting the ALJ for citing the claimant's failure to "comply with follow-up mental health treatment" as one of "three reasons for rejecting [her] statements as to pain" because that reason had "nothing to do with pain"). Additionally, despite earlier noting that he had "taken into account" the possibility that "[s]omeone with obesity and arthritis affecting a major weight-bearing joint may have more pain and limitation that might be expected from arthritis alone," R. 43, ALJ Barto did not mention Lois J.'s morbid obesity when evaluating her allegedly disabling pain-related functional limitations, *see* R. 48–50.

C.    *Analysis*

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (internal citation omitted). The ALJ does not need to discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is

---

[her] application." R. 49. In explaining this finding, however, he only cited one example where Lois J. reported to FNP Broughton that she was out of her diabetes and blood-pressure medications. *Id.* (citing R. 383). The Court declines the parties' invitation, Pl.'s Br. 12–13; Def.'s Br. 19, ECF No. 21, to assume that ALJ Barto implicitly relied upon Lois J.'s occasional noncompliance with her diabetes and blood-pressure treatment as an independent reason to discount her complaints of debilitating musculoskeletal pain, *Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) (citing *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988)). On remand, however, the Commissioner should explain how Lois J.'s repeated comments to her healthcare providers that she could not afford to purchase all of the medications they prescribed, *see* R. 327–28, 341, 381, 383–85, 428–29, 433, factor into the credibility assessment, *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment she cannot afford."). ALJ Barto did not mention that evidence anywhere in his written decision. *See* Pl.'s Br. 12–13; R. 45–49.

not enough for the ALJ to simply summarize the relevant evidence if he then fails to explain how

he resolved material ambiguities or conflicts in the record and why the credited evidence

supports his findings and conclusions. *See Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018);

*Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016). In other words, the "ALJ's failure to 'build

an accurate and logical bridge from the evidence to his conclusion'" that the claimant is not

disabled typically "constitutes reversible error." *Lewis*, 858 F.3d at 868 (quoting *Monroe*, 826

F.3d at 189). ALJ Barto's written decision does not meet these minimum standards.

First, too "[m]uch of the ALJ's RFC assessment was devoted to summary" and not

enough to logical, accurate analysis. *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014 WL

2865992, at *8 (D. Md. June 23, 2014); *see also Thomas v. Berryhill*, No. 17-2215, 2019 WL

193948, at *3 (4th Cir. Jan. 15, 2019) ("[A] proper RFC analysis has three components: (1)

evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical

explanation, is just as important as the other two."). Lois J. maintained that she could not work

during the relevant period primarily because morbid obesity and constant pain in her lower back,

right hip, and both knees severely restricted her capacities to sit, stand, and walk. *See generally*

R. 71–78, 90, 101, 238, 248–49, 251, 261, 271. In February 2016, she testified that her weight

and chronic pain essentially left her housebound. R. 73–77. ALJ Barto summarized nearly all of

the evidence bearing on these complaints, but he never explained how he concluded that Lois J.

could meet the demands of substantial gainful employment. *See Thomas*, 2019 WL 193948, at *3

(citing *Mascio*, 780 F.3d at 637–38); *Boston v. Barnhart*, 332 F. Supp. 2d 879, 888 (D. Md.

2004) (reversing and remanding where the ALJ set out "a detailed summary of the medical

evidence, but fail[ed] to engage in any discussion as to how this evidence support[ed] [the] RFC

determination"). Moreover, despite finding that Lois J.'s obesity was a "severe" MDI, R. 42,

recognizing that "obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an 8-hour workday [and] five-day week," R. 43, and summarizing treatment notes showing that Lois J. weighed at least 395 pounds and was considered "morbidly obese" throughout the relevant period, R. 45–48, ALJ Barto did not even mention obesity in his RFC analysis, R. 48–50.

Second, ALJ Barto did not provide a "narrative discussion describing how . . . specific medical facts" and nonmedical evidence "support[ed] each conclusion" in his RFC assessment. *Mascio*, 780 F.3d at 636. His written decision does include an "initial function-by-function assessment," SSR 96-8p, 1996 WL 374184, at *7, documenting his findings that Lois J. retained the RFC for "a range of light work" insofar as she could lift or carry "no more than 20 pounds at a time," frequently "lift[] or carry[] objects weighing up to 10 pounds," "stand and/or walk for up to two hours daily," and sit for "about 6 hours in an 8-hour workday," but "must change positions between sitting and standing at will." R. 44. ALJ Barto also "summarized the evidence he found credible, useful, and consistent," *Woods*, 888 F.3d at 694, with his conclusion that these limitations were "sufficient to address [her] degenerative orthopedic impairments," R. 49. *See* R. 48–50. "But the ALJ never explained how he concluded—*based on this evidence*—that [Lois J.] could actually perform" most of the physical tasks generally required for light work. *Woods*, 888 F.3d at 694. Instead, he summarily adopted the opinions of two DDS physicians, neither of whom had the benefit of reviewing imaging that showed the "bone-on-bone" condition of the medial joint spaces in both knees, that Lois J. could meet these demands without explaining *why* he found their opinions to be "balanced and objective" and "consistent with the overall evidence of record," R. 50. *Cf. Monroe*, 826 F.3d at 191 (the ALJ's failure to "specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to" when weighing

various medical opinions precluded meaningful judicial review). ALJ Barto also did not connect

his RFC finding that Lois J. "must change positions between sitting and stating at will," R. 44, to

any specific evidence in the record. *See* R. 50. The Commissioner suggests that the sit/stand

option was based on Lois J.'s testimony that she had trouble sitting for more than fifteen minutes

at one time, Def.'s Br. 11, but that rationale is not apparent from the face of ALJ Barto's

decision. *See Bates*, 726 F. App'x at 960 (citing *Patterson*, 839 F.2d at 225 n.1). "As such, the

analysis is incomplete and precludes meaningful review." *Monroe*, 826 F.3d at 191.

Finally, ALJ Barto did not explain how he weighed obviously probative evidence that

conflicted with his stated reasons for finding Lois J.'s pain and functional limitations were not as

debilitating as she alleged. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002)

("A district court will no[t] . . . revisit the ALJ's resolution of conflicting evidence. However, if

the ALJ appears, without stating a reason, to have credited some probative evidence over other

evidence or to have ignored evidence altogether, a remand or reversal may be necessary."). For

example, he did not acknowledge Lois J.'s statements to healthcare providers that directly

contradicted his finding that prescription medications had been "relatively successful" in

controlling her chronic pain, R. 48. *Cf. Golembiewski*, 322 F.3d at 917 (explaining that "it is

impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial

evidence" when it appears he "ignore[d] an entire line of evidence that is contrary to the ruling").

Similarly, while ALJ Barto reasonably found that some physical exams were generally normal or

unremarkable, R. 48–49, his decision provides no insight into how he weighed those findings

against all of the abnormal findings on X-rays and physical examinations he summarized earlier

in his decision, R. 45–58.

* * *

The Court takes no position on whether Lois J. should be awarded disability benefits.

Rather, the issue "here arises from a problem that has become all too common among [ALJ] decisions challenged in this court—a problem [agency] decision makers could avoid" if they would just "show [their] work." *Patterson*, 846 F.3d at 663 (capitalization altered). ALJ Barto's analysis in this case was so conclusory, and at points materially incomplete, that I am "left to guess about how the ALJ arrived at his conclusions" on Lois J.'s ability to perform relevant functions on a sustained basis in a competitive workplace. *Mascio*, 780 F.3d at 637. Thus, "because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*, 846 F.3d at 662. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, including any evidence that Lois J. submitted to the agency after ALJ Barto issued his decision in March 2016; explain how any material inconsistencies or ambiguities in the evidence were resolved at each stage of the disability determination process; and provide an accurate, logical description of how specific evidence in the record supports each conclusion in the RFC assessment.

## IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion, ECF No. 18, **DENY** the Commissioner's motion, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: February 5, 2019

Joel C. Hoppe
United States Magistrate Judge